

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 1 0 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| *Ex. Rel.* JOHN DOE; AND ) | |
| ) | |
| STATE OF GEORGIA, ) | |
| *Ex. Rel.* JOHN DOE; ) | **CIVIL ACTION NO.:** |
| ) | **1:16-CV-0780** |
| Plaintiffs-Relator, ) | |
| ) | |
| v. ) | **FILED *IN CAMERA*** |
| ) | **AND UNDER SEAL** |
| PIEDMONT HEALTHCARE, INC., ) | |
| PIEDMONT HOSPITAL, INC., ) | **COMPLAINT FOR** |
| PIEDMONT ATLANTA HOSPITAL, ) | **VIOLATION OF FEDERAL** |
| INC., PIEDMONT FAYETTE ) | **AND GEORGIA FALSE** |
| HOSPITAL, INC., PIEDMONT ) | **CLAIMS ACTS, 31 U.S.C. §** |
| MOUNTAINSIDE HOSPITAL, INC., ) | **3729 *et seq.*** |
| PIEDMONT NEWNAN HOSPITAL, ) | |
| INC., PIEDMONT HENRY ) | |
| HOSPITAL INC., PIEDMONT ) | |
| MEDICAL CARE CORPORATION, ) | **JURY TRIAL DEMANDED** |
| PIEDMONT CARDIOLOGY OF ) | |
| ATLANTA, LLC, PIEDMONT ) | |
| HEART INSTITUTE ) | |
| PHYSICIANS, INC., PIEDMONT ) | |
| HEART INSTITUTE, INC. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## FILED IN CAMERA AND UNDER SEAL



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 1 0 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>*Ex. Rel.* JOHN DOE; AND )<br> )<br>STATE OF GEORGIA, )<br>*Ex. Rel.* JOHN DOE; )<br> )<br>Plaintiffs-Relator, )<br> )<br>v. )<br> )<br>PIEDMONT HEALTHCARE, INC., )<br>PIEDMONT HOSPITAL, INC., )<br>PIEDMONT ATLANTA HOSPITAL, )<br>INC., PIEDMONT FAYETTE )<br>HOSPITAL, INC., PIEDMONT )<br>MOUNTAINSIDE HOSPITAL, INC., )<br>PIEDMONT NEWNAN HOSPITAL, )<br>INC., PIEDMONT HENRY )<br>HOSPITAL INC., PIEDMONT )<br>MEDICAL CARE CORPORATION, )<br>PIEDMONT CARDIOLOGY OF )<br>ATLANTA, LLC, PIEDMONT )<br>HEART INSTITUTE )<br>PHYSICIANS, INC., PIEDMONT )<br>HEART INSTITUTE, INC. )<br> )<br>Defendants. )<br>_____ ) | **CIVIL ACTION NO.:**<br>**1:16-CV-0780**<br><br>**FILED *IN CAMERA***<br>**AND UNDER SEAL**<br><br>**COMPLAINT FOR**<br>**VIOLATION OF FEDERAL**<br>**AND GEORGIA FALSE**<br>**CLAIMS ACTS, 31 U.S.C. §**<br>**3729 *et seq.***<br><br><br>**JURY TRIAL DEMANDED** |

## FILED IN CAMERA AND UNDER SEAL

1.     JOHN DOE ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against PIEDMONT HEALTHCARE, INC., PIEDMONT HOSPITAL, INC., PIEDMONT ATLANTA HOSPITAL, INC., and its current and former affiliated, owned or controlled acute care hospitals, PIEDMONT CARDIOLOGY OF ATLANTA, LLC, PIEDMONT HEART INSTITUTE PHYSICIANS, INC., and PIEDMONT HEART INSTITUTE, INC., (collectively referred to as Defendants or "Piedmont Hospital") for treble damages and civil penalties arising from the Defendants' conduct in violation of the Federal False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). The violations arise out of requests for payment by Medicare, Medicaid, and other government agencies and programs (hereinafter, collectively the "Government Healthcare Programs") based on false claims.

2.     This action is also brought on behalf of the State of Georgia (pursuant to Georgia False Medicaid Claims Act (O.C.G.A. § 49-4-168.1 *et seq*.), as well as on behalf of Relator for retaliation and wrongful termination under the whistleblower retaliation provisions of the Federal False Claims Act and the Georgia False Medicaid Claims Act.

3.     Defendants knowingly failed to be the medical necessity gatekeepers of their own hospital doors, resulting in increased costs to Government Healthcare Programs and putting patients in serious risk of morbidity. In doing so, Defendants:

     a.     Billed and collected from Government Healthcare Programs for inpatient admissions that lacked medical necessity [and in many cases, overruled the decision of the admitting physician].

     b.     Billed and collected from Government Healthcare Programs for Observation charges that were not medically necessary.

     c.     Encouraged medically unnecessary admission of patients, which resulted in physician "churning," resulting in multiple specialists, diagnostic tests and the administration of drug therapy to treat inpatients that were not medically necessary.

     d.     Knowingly failed to refund payments known to Defendants to be overpayments.

     e.     Billed and collected from patients' co-payments and deductibles when medical necessity was lacking.

     f.     Billed and collected from Government Healthcare Programs for various cardiac and vascular and procedures from Defendants' respective Cardiovascular, Diagnostic and Therapeutic Labs and facilities, including,

3

Defendants' Catheterization Laboratory ("Cath Lab"), Vascular Diagnostic Labs, and Cardiac Diagnostic Labs which are located in all Defendants' healthcare facilities, including hospitals and physician offices were not properly reviewed and interpreted by physicians.

g.     Billed and collected for cardiac and vascular diagnostic tests as inpatient procedures (including diagnostic imaging such as ultrasounds, nuclear stress tests and echocardiograms) even though those tests were performed in outpatient physician offices that were once owned by private physicians but are now owned or controlled by Piedmont Hospital and operating in over 26 free-standing locations in nonhospital settings across Metro Atlanta and North Georgia.

h.     Billed and collected from Government Healthcare Programs for diagnostic and surgical procedures used to implant temporary and permanent pacemaker devices and defibrillator devices in patients with heart arrhythmias and therapeutic cardiac and vascular procedures, when those procedures were not medically necessary.

i.     Intentionally engaged in improper and inflated not "commercially reasonable" compensation arrangements with participating cardiologists, interventional cardiologists, vascular surgeons, cardiac

4

surgeons and thoracic surgeons in excess of "fair market value" compensation in order to induce and maximize referrals in violation of various anti-kickback statutes.

    j.      Billed and collected for routine wrongful inpatient admissions and ordering of diagnostic testing and therapies of cardiovascular patients by non-physician medical personnel at Defendants' hospitals.

    4.      Incredibly, some of the misconduct alleged herein has occurred before by the Defendants or their employee-physicians while at other Atlanta hospitals. St. Joseph's Hospital, from which approximately 25% of Piedmont Atlanta's interventional cardiologists came in 2007 (in connection of the above-market- rate buy-out of their medical practice Atlanta Cardiology Group and Cath Labs as hereinafter described), was sued and settled a false claims action alleging substantially similar conduct with respect to knowingly or recklessly submitting false claims to the federal government by systematically billing Medicare, Medicaid, and other federal Payors for medical care for in-patients, where such patients did not qualify for in-patient admission under applicable federal regulations. (See U.S., Ex. Rel. Ramsey v. St. Joseph's Hospital of Atlanta, Case No. 1:04-CV-03353-TCB). In addition, Defendant Piedmont Atlanta is a repeat offender and was sued and settled a false claims action alleging that Piedmont Atlanta submitted claims for

5

physician's interpretation of some vascular laboratory tests when the physician's interpretation, in fact, had not been done. It was alleged that physicians routinely failed to conduct an independent review of the vascular test data, and instead simply signed off on the technician's interpretations and proposed diagnosis. (See <u>U.S., ex rel., Quinnelly v. Piedmont Hospital, et. al</u>, Case No. 1:03-CV-01927-RLV) filed in the United States District Court for the Northern District of Georgia (the "Prior Piedmont FCA Case").

5.     As reported in Piedmont Healthcare, Inc.'s Consolidated Financial Statements, for the period ending June 30, 2015 and 2014, its revenues exceeded $2 billion and overall net patient service revenue for the Medicare and Medicaid programs accounted for approximately 33% and 5% respectively, of its net patient revenue for the year ended June 30 2015.     Well over 90% of Defendant's cardiovascular patients are Medicare patients.

6.     According to its website www.piedmont.org/heart/heart-home, Defendant Piedmont's cardiology department has more than 85 cardiovascular specialists and 26 cardiology offices across Metro Atlanta and North Georgia.

7.     According to Defendant's 2015 Annual Report, its 1,000 hospital beds had "64,316 inpatient admissions, a 16% increase from fiscal year 2013". According to its 2015 Annual Report, Defendant performed 10,000+ cardiac/cardiovascular

6

procedures. Piedmont Cardiology is one of the highest, if not the highest, profit center of Defendant's. Members of Piedmont Atlanta's cardiovascular practices hold prominent and controlling positions at Defendant. The Chief Executive Officer and Chairman of the Board of Defendant is a vascular surgeon Patrick M. Battey, M.D., and William A. Blincoe, M.D., an interventional cardiologist, has been on the Board of Directors of Defendants.

8.      Relator is informed and believes that the false claims described herein began at least six (6) years before the filing of Relator's Complaint, and continue to date and have caused Government Healthcare Programs to be billed by Piedmont Hospital and to pay Piedmont Hospital tens of millions of dollars of medically unnecessary and otherwise illegal payments.

## FEDERAL JURISDICTION AND VENUE

9.      The acts proscribed by 31 U.S.C. § 3729 *et seq*. and complained of herein occurred in part in the Northern District of Georgia, and the Defendants do business in the Northern District of Georgia. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a), as well as under 28 U.S.C. § 1345, and 28 U.S.C. § 1331.

10.     This Court has jurisdiction over this case for the claims brought on behalf of the state of Georgia pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery

7

is sought on behalf of said state and the action arises from the same transactions and occurrences as the claim brought on behalf of the United States.    Moreover, Defendants transact business in said states.

11.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because one or more Defendants reside in this District, and one or more Defendants transact business in this District.

12.    The Court also has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because the Defendants can be found in and transact the business that is the subject matter of this lawsuit in the Northern District of Georgia.

13.    The facts and circumstances that give rise to Defendants' violation of the False Claims Act and the Georgia False Medicaid Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

14.    Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

8

## PARTIES

15.     Relator, John Doe, is a resident of the State of Georgia.

16.     PIEDMONT HEALTHCARE, INC. ("PHI").   PHI is located in Atlanta, Georgia, is a tax-exempt organization and owns and/or controls all of the Defendants.   According to it 2015 Annual Report, PHI appoints the Board of Directors of each of Defendants.

17.     PIEDMONT HOSPITAL, INC. is located in Atlanta, Georgia, is a tax-exempt organization and, on information and belief, also owns and/or controls all of Defendants.

18.     PIEDMONT ATLANTA HOSPITAL, INC. ("Atlanta").   Atlanta is located in Atlanta, Georgia, is a not-for-profit acute care hospital providing inpatient, outpatient, and emergency care services primarily for residents of the Atlanta metropolitan area.   Admitting physicians are primarily practitioners in the local area.

19.     PIEDMONT FAYETTE ATLANTA HOSPITAL, INC. ("Fayette).   Fayette is located in Fayetteville, Georgia, is a not-for-profit acute care hospital providing inpatient, outpatient, and emergency care services primarily for residents of Fayette County.

20.     PIEDMONT MOUNTAINSIDE HOSPITAL, INC. ("Mountainside").   Mountainside is located in Jasper, Georgia, is a not-for-profit acute care hospital

9

providing inpatient, outpatient, and emergency care services primarily for residents of Pickens County.

21.    PIEDMONT NEWNAN HOSPITAL, INC. ("Newnan").  Newnan is located in Newnan, Georgia, is a not-for-profit acute care hospital providing inpatient, outpatient, and emergency care services primarily for residents of Coweta County.

22.    PIEDMONT HENRY HOSPITAL, INC. ("Henry").  Henry is located in Stockbridge, Georgia, is a not-for-profit acute care hospital providing inpatient, outpatient, and emergency care services primarily for residents of Henry County.

23.    PIEDMONT MEDICAL CARE CORPORATION ("PMCC").  PMCC is located in Atlanta, Georgia, and is a taxable, not-for-profit entity whose purpose is to develop a network of primary care, hospital-based and certain specialty physicians for the benefit of PHI affiliates.

24.    PIEDMONT HEART INSTITUTE PHYSICIANS, INC. ("PHIP"). PHIP is located in Atlanta, Georgia, and is a taxable, not-for-profit entity whose purpose is to provide an integrated cardiovascular healthcare delivery program for the benefit of the PHI affiliates.

25.    PIEDMONT CARDIOLOGY OF ATLANTA, LLC ("PCA") is located in Atlanta, Georgia, and is a limited liability company, which on information and

10

belief, employs cardiovascular physicians and surgeons and support staff and which bills Government Health Care Programs for cardiovascular care and related procedures (with NPI Numbers believed to include 1275729691 and 1851553747).

26. PIEDMONT HEART INSTITUTE, INC. ("PHII"). PHII is located in Atlanta, Georgia, and is a not-for-profit entity whose purpose is to provide cardiovascular research services for the benefit of the PHI affiliates.

## THE FALSE CLAIMS ACT

27. The False Claims Act provides, in pertinent part that:

(a)(1) ... any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); ...

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000. . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

28. The False Claims Act is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

11

## GOVERNMENT HEALTHCARE PROGRAMS REIMBURSEMENT

### Medicare

29.     Medicare Part A covers the cost of hospital services and related care, and reimburses hospitals for services provided to its beneficiaries by means of a prospective payment system ("PPS").

30.     Under the PPS, Medicare pays a fixed amount of money for hospital admissions of Medicare beneficiaries determined by the Diagnostic Related Group ("DRG") into which the beneficiaries fall. This means that a pre-determined, fixed and set all-or-nothing Medicare payment is made to hospitals based on the DRG assigned to the specific beneficiary so long as the hospital admission is medically necessary.

31.     The Medicare program assigns DRGs a particular weight by which a uniform federal rate is multiplied. The more complicated and costlier the treatment is, the greater the weight to be assigned to that particular DRG. Under the PPS, to calculate the final DRG prospective payment rate for a patient discharged, the Secretary of Health and Human Services takes the federal rate, adjusted according to a locality-based wage index, and then multiplies it by the weight assigned to the patient's DRG. By statutory mandate, the Secretary must publish the weights and

12

values that are to be factored into the prospective payment calculus before each fiscal year. *See* 42 U.S.C. § 1395ww(d)(6).

32.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the Hospital Cost Report, the Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

## Medicaid

33.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program. Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor.

34.     Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with

13

the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

35.    Medicaid generally follows Medicare as to the medical necessity of inpatient admissions, utilization review, etcetera, in all material respects.

## TRICARE

36.    TRICARE is the component agency of the U.S.  Department of Defense that administers and supervises the health care program for certain military personnel and their dependents.

37.    TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers. The funds used to pay the TRICARE claims are government funds.

38.    TRICARE assigns a "provider number" to suppliers who wish to participate in the program. In order to obtain reimbursement for services, the

14

suppliers bill an insurance carrier designated by TRICARE, which insurance carrier in turn ultimately receives payment by funds from the United States.

39. An explicit tenet of the TRICARE system is that its DRG-based payment system is modeled on the Medicare PPS, and that, whenever practical, the TRICARE system will follow the same rules that apply to the Medicare PPS. *See* Tricare; Civilian Health and Medical Program of the Uniformed Services(CHAMPUS); Fiscal Year 2004 Diagnosis-Related Group Updates, 68 Fed. Reg. 60970 (Oct. 24, 2003).

## MEDICARE LAW AND REGULATIONS

### Medical Necessity

40. In addition to compliance with other national or local coverage criteria, Medicare requires as a condition of coverage that services be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A).

41. Providers must provide economical medical services and then provide such services only where medically necessary. 42 U.S.C. § 1320c-5(a)(1).

42. Providers must provide evidence that the service is medically necessary as appropriate. 42 U.S.C. § 1320c-5(a)(3).

43. Providers must ensure that services provided are not substantially in excess of the needs of such patients. 42 U.S.C § 1320a-7(b)(6) et. al.

15

## Utilization Review

44.     The law imposes specific and extensive obligations on all providers

(including hospitals) for assuring that services are medically necessary and

supported by evidence of medical necessity. 42 U.S.C. § 1395x(k) requires that

hospitals have a utilization review plan that at minimum generally contains the

following four elements:

1.     Review, on a sample or other basis, of admissions to the institution, the duration of stays therein, and the professional services (including drugs and biologicals) furnished, (A) with respect to the medical necessity of the services, and (B) for the purpose of promoting the most efficient use of available health facilities and services.

2.     Review to be made by a committee composed of two or more physicians, with or without participation of other professional personnel.

3.     Review, in each case of inpatient hospital services or extended care services furnished to such an individual during a continuous period of extended duration, as may be specified in regulations.

4.     Prompt notification to the institution, the individual, and his attending physician of any finding (made after opportunity for consultation to such attending physician) by the physician members of such committee or group that any further stay in the institution is not medically necessary.

45.     Reviews may be conducted on a sample basis, except that the utilization

review committee must review all cases reasonably assumed by the hospital to be

outlier cases because the extended length of stay exceeds the threshold criteria for

the diagnosis. 42 C.F.R. §§ 482.30(c) and (e).  Federal regulations detail the

16

requirements further in 42 CFR § 482.30 entitled "Conditions of participation: Utilization review."

46. 42 C.F.R. § 489.20 permits the hospital to have an agreement with a quality improvement organization ("QIO") to perform utilization review. Most hospitals comply with the UR requirement by means of an agreement with the QIO, and if so, the regulation at 42 CFR § 489.20(e) requires a hospital to maintain an agreement with a QIO to review admission, quality, appropriateness and diagnostic information. In this case, there must be a signed and dated agreement.

47. Hospitals frequently use "level of care criteria" as an objective tool to help make decisions regarding whether an individual's condition is severe enough, or the services provided are intense enough, to be admitted to a specific level of care. One respected product is called "InterQual," a specific utilization review screening criteria product published by the Payor division of McKesson. Other screening criteria sets used to evaluate admission appropriateness are, for example, Milliman Care Guidelines and MCAP Clinical Review Criteria.

## Inpatient Versus Outpatient Determination

48. There are ample Medicare regulations explaining when inpatient admission is appropriate versus outpatient care. An inpatient requires definitive and

17

a high level of care. Medicare Benefit Policy Manual (CMS Pub. 100-2), ch. 1, § 10

provides:

> An **inpatient** is a person who has been admitted to a hospital for bed
> occupancy for purposes of receiving inpatient hospital services.
> Generally, a patient is considered an inpatient if formally admitted as
> an inpatient with the expectation that he or she will remain at least
> overnight and occupy a bed even though it later develops that the
> patient can be discharged or transferred to another hospital and not
> actually use a hospital bed overnight.

49.     CMS identifies procedures that are typically provided only in an

inpatient setting, and therefore would not be paid by Medicare under the Outpatient

Prospective Payment System ("OPPS"). These procedures comprise what is referred

to as the "inpatient only list." The inpatient only list specifies those services that will

only be paid when provided in an inpatient setting because of the nature of the

procedure and the need for at least 24 hours of postoperative recovery time or

monitoring before the patient can be safely discharged. These procedures are

assigned a status code of "C" and hospitals are advised to admit beneficiaries

requiring these procedures to receive payment. Each year, CMS, with input from the

APC Panel, reviews the inpatient only list using specific criteria to determine

whether any procedures should be moved from the inpatient only list and assigned

to an APC (which is the payment system for outpatient procedures).  CMS updates

18

the list periodically, in large part to remove procedures from the list that staff determine can now be safely performed on an outpatient basis.

50. Simply put, outpatient admission is appropriate unless the procedure is on the Medicare Inpatient Only List (explained above), or, if the patient's condition, signs and/or symptoms indicate the need for the more intensive inpatient setting. The medical records should indicate that the patient admitted as an inpatient was individually assessed and that there were comorbidities or other factors meriting an inpatient stay.

51. Medicare refers to the guidelines for medical necessity for inpatient admission published by InterQual. InterQual guides hospitals to look at the severity of the patient's condition and intensity of the procedures in making the medical necessity determination.

52. When a hospital, through its credentialing committee, makes the decision to allow patients to be admitted to the hospital, the hospital should consider 1) the severity of the signs and symptoms exhibited by the patient, 2) the medical predictability of something adverse happening to the patient, 3) the need for diagnostic studies that appropriately are outpatient services (i.e., their performance does not ordinarily require the patient to remain at the hospital for 24 hours or more) to assist in assessing whether the patient should be admitted; and 4) the availability

19

of diagnostic procedures at the time when and at the location where the patient

presents. Hospital Manual, Ch. II §210 Covered Inpatient Hospital Services.

## Condition Code 44

53.     In Transmittal 299 (effective date of April 1, 2004), CMS established

Condition Code 44 for use by hospitals when billing for services that should have

been outpatient in the first instance. For instance, a physician may order a

beneficiary to be admitted to an inpatient bed, but upon reviewing the case later, the

hospital's utilization review committee determines that an inpatient level of care

does not meet the hospital's admission criteria. The articulated policy set forth in the

Transmittal 299 is:

> 1. In cases where a hospital utilization review committee
>    determines that an inpatient admission does not meet the
>    hospital's inpatient criteria, the hospital may change the
>    beneficiary's status from inpatient to outpatient and submit an
>    outpatient claim (TOBs 13X, 85X) for medically necessary
>    Medicare Part B services that were furnished to the beneficiary,
>    provided all of the following conditions are met:
>
>    > a. The change in patient status from inpatient to outpatient
>    >    is made prior to discharge or release, while the
>    >    beneficiary is still a patient of the hospital;
>    >
>    > b. The hospital has not submitted a claim to Medicare for
>    >    the inpatient admission;
>    >
>    > c. A physician concurs with the utilization review
>    >    committee's decision; and

20

     d. The physician's concurrence with the utilization review committee's decision is documented in the patient's medical record.

2. When the hospital has determined that it may submit an outpatient claim according to the conditions described above, the entire episode of care should be treated as though the inpatient admission never occurred and should be billed as an outpatient episode of care.

54.    On August 28, 2009, CMS included minor revisions to those sections

of Chapter 1 of the MCPM that relate to Condition Code 44.

The conditions for the use of Condition Code 44, as stated in section 50.3.2 below, require physician concurrence with the UR committee decision. For Condition Code 44 decisions, in accordance with 42 CFR §482.30(d)(1), one physician member of the UR committee may make the determination for the committee that the inpatient admission is not medically necessary. This physician member of the UR committee must be a different person from the concurring physician, who is the physician responsible for the care of the patient.

### Observation Status versus Inpatient Admission

55.    Observation care is a hospital outpatient service that is reported using

HCPCS code G0378 (Hospital observation services, per hour). Hospitals report

outpatient observation services, which are commonly provided in association with a

hospital clinic visit, emergency department visit, or other major service, on hospital

outpatient claims, just like other outpatient services. Physicians order observation

care, defined as clinically appropriate services, including ongoing short-term

21

treatment, assessment, and reassessment furnished in order for the physician to determine whether the beneficiary will require further treatment as an inpatient or whether the beneficiary may be safely discharged from the hospital. It is commonly assigned to patients who present to the emergency department and require a significant period of treatment or monitoring before an admission or discharge decision can be made.

Medicare Benefit Policy Manual (CMS Pub. 100-2), ch. 1 § 70.4.A. provides:

> Observation services are those services furnished by a hospital on the hospital's premises, including use of a bed and at least periodic monitoring by a hospital's nursing or other staff which are reasonable and necessary to evaluate an outpatient's condition or determine the need for a possible admission to the hospital as an inpatient. . . .

56.    Medicare Claims Processing Manual (CMS Pub. 100-4), ch. 4, § 290.1 repeats the definition of "observation services" and states that such services usually do not exceed one day, sometimes may span two days, and "only in rare and exceptional cases" span more than two days.

As stated by CMS in 65 Fed. Reg. 18443 (Apr. 7, 2000):

> Routinely billing an observation stay for patients recovering from outpatient surgery is not allowed under current Medicare rules nor will it be allowed under the hospital outpatient PPS. As we state in section III.C.5 of this preamble, one of the primary factors we considered as an indicator for the "inpatient only" designation is the need for at least 24 hours of postoperative care.

## **ANTI-KICKBACK STATUTE**

57. The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C.

§ 1320a-7b(b) ("Anti-Kickback Statute"), provides criminal penalties of no more

than $25,000 or five years in jail or both for the following types of persons:

(1)    whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

(A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program ....

(B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . .

(2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

23

42 U.S.C. § 1320a-7b(b).

58.    A kickback in violation of the Anti-Kickback Statute violates the FCA.

59.    A "Federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The statute applies to the performance of medical procedures. It requires that the professional judgment of the provider, and not financial considerations, guide the decision to perform medical procedures.

60.    Federal regulations identify narrow "safe harbors" that do not violate the Anti-Kickback Statute. No safe harbor applies to the conduct alleged herein.

61.    The Patient Protection and Affordability Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (H.R. 3590), which was signed into law on March 23, 2010, specifically makes a violation of the Anti-Kickback Statute actionable under the FCA. PPACA amended the Anti-Kickback Statute to provide that a "claim that includes items or services resulting from a violation [of the Anti-Kickback Statute] constitutes a false or fraudulent claim" under FCA. H.R. 3590, § 6402(f)(1); see also 42 U.S.C. § 1320a-7b(g). Moreover, it also clarified that actual knowledge of the Anti-Kickback Statute or specific intent to commit an Anti-Kickback Statute violation is not required for liability. H.R. 3590, § 6402(f)(2).; see also 42 U.S.C. § 1320a-7b(h).

24

62. Compliance with the Anti-Kickback Statute is a precondition to participation in the Government Healthcare Programs and to receive payment from the United States under Medicare pursuant to 42 C.F.R. § 413.24(f)(4)(iv) because that section requires the provider's certification that all laws and regulations have been complied with. Additionally, providers certify on CMS 855A when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to this provider... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare." Therefore, by seeking payment from the United States, healthcare providers certify their compliance with the Anti-Kickback Statute, and the failure to comply renders the provider ineligible for payment.

63. The State of Georgia has enacted anti-kickback statutes, the provisions of which substantially mirror the Anti-Kickback Statute. Relators also assert claims under these State anti- kickback laws.

## THE STARK LAW

64.     The Ethics in Patient Referrals Act of 1989 § 6204, Omnibus Budget

Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106 (Dec. 19, 1989)

(codified at 42 U.S.C. § 1395nn) ("Stark I") as amended by the Omnibus Budget

Reconciliation Act of 1993, Pub. L. No. 103-66, § 13,562, 107 Stat. 312 (Aug. 10,

1993) ("Stark II"), the Patient Protection and Affordability Care Act, Pub. L. No.

111-148, §§ 6001(a), 6003 (a), 124 Stat. 119 (Mar. 23, 2010), and the Health Care

and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1106, 124 Stat.

1029 (Mar. 30, 2010) (collectively, "Stark Law") sets forth extensive prohibitions

on the referrals that a physician can make when such referrals are tied to financial

gain:

(1)     … Except as provided in subsection (b) of this section, if a
physician (or immediate family member of such physician) has a
financial relationship with an entity specified in paragraph (2), then--

(A)     the physician may not make a referral to the entity for the
furnishing of designated health services for which payment
otherwise may be made under this subchapter, and

(B)     the entity may not present or cause to be presented a claim
under this subchapter or bill to any individual, third party payor,
or other entity for designated health services furnished pursuant
to a referral prohibited under subparagraph (A).

26

(2)     Financial relationship specified

For purposes of this section, a financial relationship of a physician (or an immediate family member of such physician) with an entity specified in this paragraph is--

> (A)  except as provided in subsections (c) and (d) of this section, an ownership or investment interest in the entity, or
>
> (B)  except as provided in subsection (e) of this section, a compensation arrangement (as defined in subsection (h)(1) of this section) between the physician (or an immediate family member of such physician) and the entity.

An ownership or investment interest described in subparagraph (A) may be through equity, debt, or other means and includes an interest in an entity that holds an ownership or investment interest in an entity providing the designated health service.

42 U.S.C. § 1395nn(a)(1)-(2).

65.     The phrase "designated health services" is defined to include clinical laboratory services; physical therapy services occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; and outpatient speech-language pathology services. 42 U.S.C. § 1395nn(h)(6).

27

66. A referral in violation of the Stark Law violates the FCA.

67. Federal regulations identify narrow "safe harbors" that do not violate then Stark Law. No safe harbor applies to the conduct alleged herein.

68. Compliance with the Stark Law is a precondition to participation in the Government Healthcare Programs and to receive payment from the United States under Medicare pursuant to 42 C.F.R. § 413.24(f)(4)(iv) because that section requires the provider's certification that all laws and regulations have been complied with. Additionally, providers certify on CMS 855A when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to this provider... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare." Therefore, by seeking payment from the United States, healthcare providers certify their compliance with the Stark Law, and the failure to comply renders the provider ineligible for payment.

69. The false certification of compliance with the Stark Law results in liability under the FCA.

28

70.     The federal-state Medicaid program in each state requires providers to comply with all Medicaid requirements in Federal laws. This includes, as a condition of payment, compliance with the Stark Law. The State of Georgia has enacted anti-referral laws, the provisions of which substantially mirror the Stark Law. Relators assert claims under the Georgia State self-referral laws.

## SUBSTANTIVE ALLEGATIONS

## I.     Inpatient Claims for Outpatient Surgical Procedures

71.     The development of various technologies, such as new surgical techniques and devices, have changed the pattern of care for certain surgeries from inpatient care to ambulatory outpatient care. Some procedures formerly performed only in the inpatient setting have become entirely appropriate for outpatient care.

72.     CMS identifies procedures that are typically provided only in an inpatient setting, and therefore would not be paid by Medicare under the Outpatient Prospective Payment System ("OPPS"). These procedures comprise what is referred to as the "inpatient only list." The inpatient only list specifies those services that will only be paid when provided in an inpatient setting because of the nature of the procedure and the need for at least 24 hours of postoperative recovery time or monitoring before the patient can be safely discharged.

73.    Most, if not all hospital systems, consider the procedures not on the inpatient-only list as an outpatient procedure, absent unique medical necessity for inpatient admission. Defendants' admitted patients for procedures which could be performed on an outpatient basis. Defendants did not choose to follow CMS and/or InterQual's guidelines which generally classifies them as outpatient procedures. Instead, Defendants exploited the DRG reimbursement methodology with a scheme to ensure high revenue for Defendants' hospitals through unnecessary inpatient stays.

74.    For the following procedures (extracted from CMS Data available for Defendants for 2013 based upon the top 100 DRGs based on total discharges), for example, Defendants have consistently admitted patients who were typically discharged within 23 hours of admission to inpatient status, and submitted inpatient claims for the patients, which inpatient DRG claims lacked medical necessity.

| DRG Definition[1] | Average Covered Charges | Average Total Payments | Average Medicare Payments |
|---|---|---|---|
| 238 - MAJOR CARDIOVASC PROCEDURES W/O MCC | $77,402.51 | $19,498.54 | $16,648.02 |

[1]    DRG Summary for Medicare Inpatient Prospective Payment Hospitals, FY2013
Top 100 DRGs Based on Total Discharges
Includes discharges from Hospitals located within the 50 United States and District of Columbia
Note: Hospitals with fewer than 11 discharges within a DRG have been suppressed for that DRG

| DRG Definition[1] | Average Covered Charges | Average Total Payments | Average Medicare Payments |
|---|---|---|---|
| 243 - PERMANENT CARDIAC PACEMAKER IMPLANT W CC | $59,899.41 | $14,622.10 | $13,488.67 |
| 244 - PERMANENT CARDIAC PACEMAKER IMPLANT W/O CC/MCC | $47,534.78 | $12,131.06 | $10,072.44 |
| 246 - PERC CARDIOVASC PROC W DRUG-ELUTING STENT W MCC OR 4+ VESSELS/STENTS | $114,474.49 | $22,098.23 | $20,222.81 |
| 247 - PERC CARDIOVASC PROC W DRUG-ELUTING STENT W/O MCC | $73,780.72 | $12,213.05 | $10,040.37 |
| 251 - PERC CARDIOVASC PROC W/O CORONARY ARTERY STENT W/O MCC | $61,756.96 | $11,166.27 | $9,479.60 |
| 252 - OTHER VASCULAR PROCEDURES W MCC | $120,915.48 | $24,799.46 | $22,494.17 |
| 253 - OTHER VASCULAR PROCEDURES W CC | $73,193.69 | $17,214.03 | $11,654.83 |
| 254 - OTHER VASCULAR PROCEDURES W/O CC/MCC | $65,736.60 | $10,341.47 | $8,898.27 |
| 280 - ACUTE MYOCARDIAL INFARCTION, DISCHARGED ALIVE W MCC | $64,888.68 | $13,644.02 | $12,304.22 |
| 281 - ACUTE MYOCARDIAL INFARCTION, DISCHARGED ALIVE W CC | $34,324.46 | $6,629.27 | $5,100.61 |
| 282 - ACUTE MYOCARDIAL INFARCTION, DISCHARGED ALIVE W/O CC/MCC | $25,594.93 | $4,451.33 | $3,265.73 |
| 286 - CIRCULATORY DISORDERS EXCEPT AMI, W CARD CATH W MCC | $67,340.58 | $13,662.40 | $11,090.76 |
| 287 - CIRCULATORY DISORDERS EXCEPT AMI, W CARD CATH W/O MCC | $41,205.54 | $6,946.32 | $4,724.36 |
| 291 - HEART FAILURE & SHOCK W MCC | $54,360.43 | $11,623.80 | $9,656.14 |
| 292 - HEART FAILURE & SHOCK W CC | $27,402.62 | $6,986.32 | $4,958.43 |
| 293 - HEART FAILURE & SHOCK W/O CC/MCC | $13,489.43 | $4,452.71 | $2,549.64 |

31

| DRG Definition[1] | Average Covered Charges | Average Total Payments | Average Medicare Payments |
|---|---|---|---|
| 300 - PERIPHERAL VASCULAR DISORDERS W CC | $21,396.33 | $5,639.33 | $4,458.23 |
| 308 - CARDIAC ARRHYTHMIA & CONDUCTION DISORDERS W MCC | $36,676.07 | $8,065.19 | $6,083.61 |
| 309 - CARDIAC ARRHYTHMIA & CONDUCTION DISORDERS W CC | $18,715.95 | $4,966.40 | $3,506.19 |
| 310 - CARDIAC ARRHYTHMIA & CONDUCTION DISORDERS W/O CC/MCC | $11,432.65 | $3,313.43 | $1,923.16 |

## Pacemaker and ICD Implantations

75.    Pacemakers are battery-powered implantable devices that function to electrically stimulate the heart to contract and thus to pump blood throughout the body. Pacemakers consist of a pager-sized housing device that contains a battery, the electronic circuitry that runs the pacemaker, and one or two long thin wires that travel through a vein in the chest to the heart. Pacemakers are usually implanted in patients whose heart's own "spark plug" or electrical system is no longer functioning normally.

76.    The implantable cardioverter defibrillator ("ICD") is a device used to treat dangerously fast heart rates that occur in the lower chambers of the heart (the main pumping chambers).   The ICD system looks much like a pacemaker. The

32

device is implanted under the skin and attached to one or more leads, which are placed in or on the heart muscle.

77.     It has been medically unnecessary, in general, to admit pacemaker or ICD patients for implantation procedures.  Indeed, the Heart Rhythm Society ("HRS") has recently stated that inpatient status is required only for "patients who require more intensive monitoring, intravenous hydration, medication titration and extended nursing or physician care."

78.     Defendants    performed    many    other    cardiac,    vascular    and electrophysiology procedures including electrophysiology diagnostic procedures, electrophysiology ablation procedures, lead extractions, and billed them as inpatient. The information from Boston Scientific Guidepost Reimbursement Resources 2015 Procedural Payment Guide attached as Exhibit "A" demonstrates that by making these procedures identified therein inpatient the DRG payment multiplies 300-400% for 2015.

79.     Defendants knew that such inpatient stays for the procedures were, in the vast majority of cases, medically unnecessary.  By Defendants encouraging and directing that patients be admitted for the procedures, Defendant hospitals sought to maximize reimbursement for hospitals by exploiting the high reimbursement rate under inpatient DRGs intended for much longer and costlier stays.  The entire goal

33

of Defendants' campaign was to persuade Defendants' hospitals to treat these procedures and conditions as inpatient admissions, to maximize profit and revenue.

## Inpatient Claims Lacked Medical Necessity

80.     Defendants admitted patients who did not meet medical necessity criteria. Patients who should have been admitted (at most) for observation only and then discharged, were instead routinely admitted as in-patients.  Defendants did not have a consistent process/policy for refunds or rebilling of overpayments and routinely failed to submit a revised UB-04 claim form to their fiscal intermediary to indicate that Defendants would be liable for the cost of the admission.   There was also confusion and also a lack of process/policy for case management to notify the business office not to bill an admission when medical necessity was lacking.

## Claims for Observation Patients Over 48 Hours

81.     Observation cases that extend beyond 48 hours should be "rare occurrences" per CMS Transmittal 42 effective 1/1/2006, yet Defendants repeatedly billed for medically unnecessary observation hours in excess of 48 hours.

## Claims Made for Inpatient Status in Direct Contradiction of Physician Admission Orders

82.     The hospital cannot bill an inpatient admission without a physician order.   The admitting physician who performs the procedure is responsible for determining the level of service required for patients when they arrive at the hospital.

34

The order must clearly indicate the level of care required and documentation in the medical record must support medical necessity of the inpatient admission.

83.     Defendants submitted thousands of claims for inpatient status that directly contradicted a treating physician admission order indicating outpatient and/or observation status and which patients were discharged within 23 hours of admission. For example, the following claims for patients identified on Exhibit "B" were believed to be submitted in direct contradiction to the original treating physician orders and, thereafter, the physicians were pressured by Defendants to years later supply justifications under pressure from Defendants and its Utilization Review Committee for RAC auditors for inpatient admissions. It is clear that hospitals, peer review organizations (such as the Utilization Review Committee), etc. should not apply "hindsight" in determining medical necessity of admission. Many patients received such outpatient treatment for cardiac and vascular conditions involving CPT Codes. Selected CPT Codes are for selected vascular and cardiac procedures only listed below and should be read with those cardiac and vascular procedures and related procedure attached as Exhibit "A".

| CPT Code | CPT CMS Description |
|---|---|
| 35470 | Trnslm Angplst-perc; Tibperon/ |
| 35471 | Trnslumnl Angiopl Percut; Rena |
| 35472 | Trnslum Balloon Angio Percut; A |
| 35473 | Trnslum Balloon Angiopercut;  I |

35

| CPT Code | CPT CMS Description |
|---|---|
| 35474 | Trnsluminal Angiopl Percut; Fe |
| 35475 | Trnslm Angplst-perc; Brachcep/ |
| 35476 | Trnslum Balloon Angio Percut; V |
| 35493 | Trnslm Periph Atherec Perq; Fe |
| 35495 | Trnslum Periph Atherec Perq; T |
| 37184 | Primary percutaneous transluminal mechanical throm |
| 37185 | Primary percutaneous transluminal mechanical throm |
| 37186 | Secondary percutaneous transluminal thrombectomy |
| 37201 | Transcath Therap Infus-thrombo |
| 37205 | Transcath Plcmt Iv Stent Perqe |
| 37206 | Transcath Plcmt Iv Stent Percu |
| 37215 | Transcatheter placement of intravascular stent(s) |
| 37227 | Revasc, endovasc, unilateral; with transluminal st |
| 37250 | Intravasc Us During Therap; In |
| 37251 | Intravasc Us During Therap; Ea |
| 37620 | Interrupt Part/com pit-infer Ve |
| 75940 | Percut Plemt Ivc Filter-rad S |
| 75945 | Intravasc Us Rad S/i; Initial (Pro Only) |
| 75960 | Transcath Intro Iv Stent-s & I |
| 75962 | Translum Balloon Angiopl Perip |
| 75964 | Translum Balloon Angiopl Ea Ad |
| 75966 | Translum Baloon Angiopl Renal- |
| 75992 | Translum Atherect Peripher Art |
| 75993 | Translum Atherect Ea Add Perip |
| 92973 | Prq. Transluminal Cor Thrombec |
| 92978 | Intravas Us (corn/grt) -si&r |
| 92980 | Transcath Placmt Incoronary Sten |

84. As evidence of the Defendants' practice of making most cardiology patients inpatient, CMS through its recovery auditor for the region, Connolly Healthcare began to investigate Defendants' billing practices through Recovery Auditors ("RACs") for periods of at least 2011-2013. Among other things, these RAC auditors questioned why, among other things, at least many hundreds of

patients—who were discharged within 23 hours after receiving various medical procedures from Defendants' interventional cardiology practice—were billed as inpatients and sought justification as to why patient's admissions were changed from overnight observation status to inpatient status. Until that time, many of the admitting and treating physicians and staff were unaware that Defendants were billing patients' Government Healthcare Programs as inpatients rather than outpatients. Defendants began a coordinated and concerted effort to coerce and exert enormous pressure on its employees, including the Relator, to create unjustified explanations exaggerating complexity to medical inpatient admission and threatened those who were reluctant to comply, including the Relator.

85. According to the American Hospital Association, ("AHA"), RACTrac survey results from the fourth quarter of 2013, 93 percent of reporting hospitals reported some RAC activity, and half of those indicated that denials for medically unnecessary short stays were the most complex denials they find.

86. According to AHA on average, for reporting hospitals, a "complex review" represented a takeback of $5,659, while an automated review average takeback was $882. A third of RACTrac participating hospitals reported that the largest financial impact for medical necessity denials was for drug-related stents and syncope and collapse (MD-DRG-247 and 412). Another 14 percent of hospitals

37

reported that their most costly medical necessity denials were from chest pains or transient ischemia (MS-DRGs 313 and 69).

87.    In addition, in the PEPPER (Program for Evaluating Payment Patters Electronic Report) report from the same period (under the section on percutaneous cardiovascular procedures at risk), high-volume DRGs 246, 247, 248 and 249 are identified as being at risk for improper payment by all Centers for Medicare and Medicaid ("CMS") auditors. The PEPPER report also identified the top medical and surgical DRGs by volume for one-say stays, which we know are focus areas for the RACs. By volume, eight of the top 20 medical DRGs that are listed as exhibiting high risk for denial for one-day stays are cardiovascular-related (310, 313, 312, 69, 287, 309, 292 and 293). Nine of the top 20 surgical DRGs are cardiovascular-related, with MS-DRG 247 at the top of the list (along with 247, 238, 254, 227, 244, 253 and 36). See Elizabeth Lamkin & Amanda Berglund, "Cardiac Services: Get Proactive About a Department-Level RAC Strategy," RACmonitor (August 2014), available at      http://www.racmonitor.com/rac-enews/1709-cardiac-services-get-proactive-about-a-department.

88.    In order to seek to justify its billed inpatient stays, Defendants under the leadership of Dr. Mark Cohen, Chief of Quality, Informatics and Information Technology at the Piedmont Heart Institute and Dr. Charles Brown, Chief Medical

Officer at the Piedmont Heart Institute led a Spanish Inquisition-like campaign to coerce, threaten and harass Defendants' physicians to help Defendants improperly justify these outpatient procedures as inpatient proceeds. Defendants also retained Paragon Health from Texas to assist in recruiting admission justifications. Physicians and staff were threatened to agree with Defendants, and often canned boilerplate justifications written in many cases by non-physicians and general practitioners who are not specialized in cardiovascular care or decision making for inpatient stays often years after the patients were discharged. Some physicians and staff were not even aware until approached by Mark Cohen and the Utilization Review Committee that their outpatient or observation patients had been discharged within 23 hours and these patients had been billed by Defendants as inpatients. Dr. Paul Herd, believed to be an internist was one of the leading physicians of the Utilization Review Committee and was a named defendant in the Prior Piedmont FCA case. Notably, Defendants did not request physicians to undertake the same justification exercise or to change their outpatients or observation patients to inpatients for private pay patients! Those physicians and staff who were reluctant or slow to comply with these directions had their practices disrupted, were ostracized, ordered to work in isolated windowless rooms, physically threatened, support staff reduced, lost positions and titles, received continued threats as to

39

consequences of non-compliance, were falsely accused of professional incompetence, were forced to participate in mandatory weekly and monthly reviews, and were also penalized financially.

## Churning

89. In addition to inducing unnecessary and expensive inpatient procedures, Defendants have knowingly caused and assisted physicians to admit their patients and treat them as inpatients when it was not medically necessary to do so. In some hospitals, this in turn facilitated physician churning, where multiple specialist physicians are called in to consult on an admitted patient and in turn order a host of medically unnecessary diagnostic tests.

## Failure to Refund Known Overpayments

90. Defendants have been on notice that they have been admitting patients as inpatients without medical necessity, a practice that has led to multiple instances of overpayment, of which Defendants had a duty to disclose. Instead, Defendants, in violation of 31 U.S.C. § 3729 (a)(1)(G) knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government.[2]

---

[2] The FCA, as amended in 2009, has no presentment and no specific identification of claims required. CMS issued its final rule on overpayments/wrongful retention on February 11, 2016. Overpayments must be properly reported and refunded within 60 days of when it is identified Providers cannot offset identified overpayments with

40

II. **Failure by Piedmont Atlanta Cardiac Catheterization Lab to Conduct Independent Review of Cardiovascular Test Data by Simply Signing Off on Technician's Interpretations and Proposed Diagnosis from Boilerplate/Canned Scripts.**

91.    It is estimated that many thousands of studies are performed each year at the Piedmont Atlanta Cardiac Catheterization Lab, which is currently headed by Dr. William Knapp, its Medical Director, former Managing Partner of ACG who left St. Joseph's Hospital to join Defendants in November 2007. Dr. Patrick Batty was the head of the Vascular Lab until he became CEO of Defendants.

92.    The Cardiac Catheterization Laboratory--also known as "the Cath Lab"--has two functions: 1) Cardiologists, assisted by a team of specialty nurses and radiologic technicians, perform cardiology diagnostic procedures; and 2) Interventional cardiac procedures are also performed in the Cath Lab. Cardiac catheterization allows cardiologists to measure blood pressure, oxygen levels and detect and repair blockages.

93.    During a catheterization, a cardiologist guides a catheter (a thin plastic tube) through an artery in the arm or leg into coronary arteries. Dye is injected through the catheter in order to make images that can be captured in an X-ray. This

---

identified overpayments. See, e.g., https://www.federalregister.gov/articles/2016/02/12/2016-02789/medicare-program-reporting-and-returning-of-overpayments.

test can measure blood pressure and blood oxygen levels, and detects blockages that may have to be repaired.

94.    Other catheterization procedures include:

    (A)    Diagnostic right and left heart catheterization to assess and diagnose coronary artery disease;

    (B)    Percutaneous coronary angioplasty (PTCA);

    (C)    Coronary artery stent placement;

    (D)    Direct angioplasty for treatment of acute myocardial infarction;

    (E)    Intravascular ultrasound;

    (F)    Intra-aortic balloon pump;

    (G)    Pacemaker placement;

    (H)    Procedural education;

    (I)    Diagnostic peripheral arterial catheterization;

    (J)    Percutaneous peripheral arterial intervention (stent placement, angioplasty, limb salvage);

    (K)    Diagnostic and intervention peripheral arterial procedures;

    (L)    Defibrillator;

    (M)    Electrophysiology Diagnostic Procedures;

    (N)    Electrophysiology Ablations;

    (O)    Cardia Bypass Surgery; and

    (P)    Surgical Heart Implants like ventricular assist devices.

test can measure blood pressure and blood oxygen levels, and detects blockages that

may have to be repaired.

94.    Other catheterization procedures include:

(A)    Diagnostic right and left heart catheterization to assess and diagnose coronary artery disease;

(B)    Percutaneous coronary angioplasty (PTCA);

(C)    Coronary artery stent placement;

(D)    Direct angioplasty for treatment of acute myocardial infarction;

(E)    Intravascular ultrasound;

(F)    Intra-aortic balloon pump;

(G)    Pacemaker placement;

(H)    Procedural education;

(I)    Diagnostic peripheral arterial catheterization;

(J)    Percutaneous peripheral arterial intervention (stent placement, angioplasty, limb salvage);

(K)    Diagnostic and intervention peripheral arterial procedures;

(L)    Defibrillator;

(M)    Electrophysiology Diagnostic Procedures;

(N)    Electrophysiology Ablations;

(O)    Cardia Bypass Surgery; and

(P)    Surgical Heart Implants like ventricular assist devices.

95.     Defendants' physicians and others order and rely upon the diagnostic, screening, or confirmatory tests in the treatment of their outpatients and inpatients from the Cardiac Catheterization Lab. Numerous tests are ordered on daily basis.

96.     The accuracy of non-invasive cardiovascular diagnostic studies depends on the knowledge, skill and experience of the technologist and, most importantly, the physician who is charged with conducting the interpretation.

97.     The entire cardiovascular study integrity and quality is dependent on a qualified physician who actually takes the time to review and interpret the preliminary studies prepared by the technologists. Only the physician can properly render a diagnosis from the studies completed in the Cath Lab.

98.     The interpreting physician is supposed to review the cardiovascular chart, the technologist final report, and the study itself, and then sign off on the report after any changes are made to the technologist un-interpreted report. However, Defendants developed and enforced a policy of having the physician sign off on a canned technologist report and threatened, intimidated and chastised physicians who sought to change or correct these reports.

99.     Defendants then submits the claims to a third party for performing the technical portion of the test. Defendants' claim is for the technical component of the test.  Defendants submit claims to Medicare, Medicaid and other federally funded

43

programs or third parties requesting payment for interpreting the results of these tests. The interpreting physicians are generously reimbursed for their supposed "interpretation" of these tests.

100.  The interpreting physicians are not properly interpreting the studies performed in the Cardiac, Vascular and Cath Labs. The quality and accuracy of the studies performed is entirely dependent on one aspect of the process--the interpreting physician reviewing the cardiovascular chart, the specific study performed and then independently deciding whether the technologist's report is accurate.  Only after these critical steps are complete can the interpreting physician provide his professional medical interpretation and diagnosis. The interpreting physician can earn significant amounts of money interpreting these studies.

101.  Based on Relator's observations, Relator observed that cardiovascular interpreting physicians were not properly reviewing the studies, but simply countersigning or checking a box on the electronic medical record (which system became operational on or about 2013/2014) to approve the un-interpreted and often boilerplate/canned technologist/non-physician final reports. Relator has direct and independent knowledge having personally observed this pattern since inception of his/her duties at Defendant.

44

102.  The absence of physician interpretation and involvement raises significant "quality of care" issues, patient endangerment and safety and taints the professional and technical component of the billing to Medicare, Medicaid and other governmental providers.

103.  Diagnostic decisions based upon reports generated by the Cardiac, Vascular and Cath Labs can make the difference in the patient's life, outcome or death. Relator observed that there was no way for the patient, the patient's family or, in many cases, the referring physician, to know that the critical studies, reports and diagnosis generated by the Cardiac, Vascular and Cath Labs was being written and prepared without any meaningful physician interpretation or input.

104.  Set forth on Exhibit "C" attached hereto is a list that outlines some of these diagnostic tests at Defendants' Cardiac, Vascular and Cath Labs at issue as well as the applicable CPT codes.

## III.    Defendants' Fraudulent Billing Scheme for Hospital Charges in Non-Hospital Settings in Physician Cardiology Practice Offices.

105.  Medicare Part B pays for services that physicians provide to program beneficiaries.  Physician services include medical and surgical procedures, office visits, and medical consultations and may be provided in facility settings, such as

45

hospital outpatient departments (Code 22), or in non-facility locations, such as physician offices (Code 11) and independent clinics (Code 49).

106. The amount of the physician charge varies depending on whether the service was provided in facility or non-facility location. 42 C.F.R. § 414.22 (b)(5)(I)(A)-(B). Generally, the physician payment is higher if the service is performed at a non-facility location, e.g., an office, in order to account for the increased practice expenses that physicians incur at their offices or other non-facility locations.

107. Even though the physician payment is lower if the service is performed at a facility location, e.g., an outpatient hospital department, the physician can bill for the physician payment plus the facility can bill for the outpatient facility reimbursement payment (which is intended to go to the facility itself, not the physician). Therefore, the overall reimbursement would be maximized by submitting a claim stating that the service was performed at a facility location insofar as the total reimbursement, i.e., the physician charge plus the outpatient facility reimbursement, is much higher than only the non-facility physician rate.

108. Defendants, directly and through their employees, agents, and co-conspirators, have knowingly submitted, or have caused to be submitted, claims for reimbursement to the Government Healthcare Programs that falsely and fraudulently

46

coded the place of service at the Defendants' approximately 26 physician cardiology practice locations listed on Exhibit "D" attached herewith as if it were a hospital facility. Many of these physician practices were acquired by Defendants over the last approximately eight years. Specifically, Defendants authorized and caused its physician practices to bill the Government Healthcare Programs for diagnostic cardiac testing and imaging and other outpatient procedures, such as stress tests (CPT 93016-93018) and echocardiography (CPT 93306-93308), under the provider codes registered to various Defendant Piedmont hospitals as a hospital service when in fact the service was performed at one of the physician cardiology practice locations. At best, a special demarcated artificial wall was constructed to separate these physician cardiology offices. However, the same technologist located at the doctor's office were interpreting these tests for the same patient seen by the cardiologist in the same physician office. This billing practice enables Defendants' to bill the Government Healthcare Programs for the lower non-facility physician payment, but also for the higher outpatient facility payment as well, which they were not entitled to receive.

109. The procedures performed included ultrasounds, nuclear diagnostic testing including nuclear stress tests, EKG stress testing and other echocardiology services. The procedures were performed at Defendant's cardiology offices, but

47

were billed as being performed at various Piedmont Hospital locations. Relator believes that Defendants' cardiovascular physicians perform and bill approximately tens of thousands of diagnostic cardiovascular tests each year! The amounts so falsely billed inflated the charges 4-5 times in many cases! The physicians would submit a claim for the physician reimbursement, and the various Defendant Piedmont hospitals would submit a claim for the facility reimbursement, despite that facility not actually being used for the procedure.

110.  As set forth above, Defendant physician offices, directly and through their agents, employees, and co-conspirators, including Defendants, knowingly provided false statements as to the actual place of service to Defendant physician offices with the instruction to prepare and submit claims for payment based on the false statements. At all times, Defendants, including Defendant physician offices, knew that these claims for payment or approval were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false. Nonetheless, Defendants have knowingly submitted, or caused to be submitted, false and fraudulent claims for reimbursement to the Government Healthcare Programs that falsely coded the actual place of service.

48

## IV. Medically Unnecessary Cardiac Procedures.

111. Defendants have engaged in an unlawful scheme to maximize the reimbursements paid by the Government Healthcare Programs for diagnostic and therapeutic cardiac and vascular procedures. Defendants' five hospitals with, on information and belief, more than 85 cardiovascular specialists and 26 cardiology offices across Metro Atlanta and the State of Georgia are working towards a near monopoly over the cardiology and vascular practice in parts of Metro Atlanta and control a significant percentage of the referral of patients to hospitals for cardiac and vascular procedures in this area.

112. Defendants use their market power and influence to control the cardiac and vascular practices at their hospitals and the procedures and practices of its physicians, including, but not limited to, billing, quality control and utilization review, performance of cardiac and vascular procedures, catheterization laboratory access, and the approval of cardiologists who receive staff privileges at Defendants' hospitals. Physicians who did not "play ball" were ostracized, penalized, threatened personally and professionally and/or terminated or lost admitting privileges. Upon information and belief, most if not almost all cardiologists with staff privileges at Defendants' hospitals are employed by Defendants and their 26 cardiology offices. Defendants' cardiologists perform their diagnostic testing and imaging at their

49

offices and, as discussed below, they have an illegal arrangement to refer patients exclusively to Defendants' hospitals and other hospitals operated by Defendant for therapeutic cardiac and vascular procedures.

113.   Defendants act in concert with Defendants, to knowingly submit false and fraudulent claims for payment to the Government Healthcare Programs for medically unnecessary coronary, vascular and electrophysiology diagnostic and therapeutic procedures and falsely document in patient records the appropriateness of such procedures.   To facilitate and conceal the scheme, Defendants have knowingly failed to implement protocols, including a data driven quality assurance and an open and unbiased peer review program, to detect the performance of unnecessary procedures and promote patient safety. Instead, Defendants put into practice sham canned review procedures and protocols controlled by Defendants and other co-conspirators to maximize profits.

114.   This Complaint challenges at least three types of procedures regularly performed by Defendants:   (i) diagnostic and therapeutic cardiac procedures, including diagnostic cardiac tests, diagnostic cardiac catheterizations, cardiac angioplasties, coronary stents, and CABGs, to diagnose and treat patients with coronary artery disease ("CAD"); (ii) diagnostic and surgical procedures used to implant temporary and permanent pacemaker devices in patients with heart

50

arrhythmias; and (iii) therapeutic vascular procedures, including percutaneous transluminal arterial angioplasty ("PTA") and stenting in the vascular beds of patients, including the renal, iliac, and superficial femoral arteries and bypass surgeries and electrophysiology procedures that include electrophysiology studies, pacemakers, defibrillators, ablation procedures and lead extractions.

115. In addition, in lieu of these invasive procedures, regardless of low or medium severity of their condition, patients were not presented with options to employ various non-invasive drug durable medical management therapies such as anti-anginal therapies first rather than undergo such coronary stenting or cardiac bypass procedures, which present patients with serious medical risks and complications. Patients who did not meet the accepted "appropriate use" medical criteria established by the American College of Cardiology and American Heart Association for such invasive procedures (such as failed medical and drug treatment and abnormal diagnostic stress tests or heart attacks) should have been given drug therapy rather than risk unnecessary complications from these invasive and expensive procedures with, in many cases, no scientific benefit http://content.onlinejacc.org/article.aspx?articleid=1201161. Relator observed that almost immediately before Defendants performed these procedures in the Cath Lab that nurses--without doctors' orders--regularly and routinely administered anti-

51

anginal drugs that control chest pain like nitropaste (designed to open up heart blood vessels), which lacked medical necessity and were dangerous, it would have been more appropriate and reasonable for Defendants to have properly proscribed long acting nitroglycerin drugs for a period of days or weeks before the procedures and surgery as would have been more cost effective, beneficial and appropriate. Administering this drug right before the major invasive cardiac procedures means patients were never given the option of appropriate complete medical therapy before exposing them to major risk, adverse expense and invasive cardiovascular procedures that were financially lucrative to the Defendants.

116. First, Defendants have knowingly and routinely performed therapeutic cardiac catheterizations and stenting when it is not reasonable or medically necessary for the treatment of the patient. The CAD patients targeted by Defendants under this part of the scheme suffer from the build-up of plaque on their blood vessels, which causes the vessels to narrow (known as stenosis) and restricts the flow of blood, oxygen, and nutrients to the heart. To determine which procedures would be reasonable and medically necessary for the treatment of each patient, cardiologists perform diagnostic tests, including, for example, stress tests, echocardiograms, or electrocardiograms.   In some cases, diagnostic cardiac catheterizations are performed by inserting a long, thin catheter through the blood

52

vessels and into the coronary arteries using an x-ray machine. A coronary angiogram is created by injecting a contrast material through the catheter as x-rays are taken.

117. If one or more of the coronary arteries is blocked, one treatment option is a procedure known as a percutaneous transluminal coronary angioplasty ("PTCA"), which reopens the blocked artery by inserting a balloon catheter through the arteries and into the patient's heart and inflating a small balloon at the end of the catheter inside the blocked artery. The balloon expands the blocked vessel, allowing blood to flow more freely.

118. Physicians may also implant a bare metal or drug-eluting stent, which is a small metal tube implanted in the vessel to keep the artery permanently open. The well-recognized standard of care for the implantation of coronary stents in patients is that the blockage (stenosis) of the target artery must be greater than or equal to 80 percent as determined by ultrasound and other recognized diagnostic tests.

119. Defendants' fraudulent scheme to perform therapeutic cardiac procedures, including PTCAs and stents, which are not reasonable or medically necessary to treat the patients' CAD, is effectuated by Defendants, which perform the diagnostic tests. Even though such tests indicate that a PTCA or PTCA with stent is not reasonable or medically appropriate for the treatment of the patient,

Defendants, directly and through their agents, employees, and cardiologists, falsely document the existence or extent of a lesion in the patients' medical records and refer them to Defendants' hospitals, where the unnecessary procedures are then performed by the cardiologists employed by Defendants. In many instances, Defendants order patients to have routine follow-up visits to undergo further unnecessary diagnostic testing. The medically unnecessary procedures were performed with the knowledge and authorization of Defendants, who profit from the scheme.

120. Second, Defendants, directly and through their agents, employees, and co-conspirators, have knowingly and routinely performed surgical procedures known as coronary artery bypass grafts ("CABG") in patients. CABG is an alternative treatment to PTCA for patients with CAD. If one or more of the coronary arteries is blocked, a healthy artery or vein from the body may be connected, or grafted, to the blocked coronary artery. The grafted artery or vein bypasses the blocked portion of the coronary artery to create a new pathway for blood to flow freely to the heart.

121. Defendants' fraudulent scheme to perform medically unnecessary CABG in patients is effectuated by Defendants, who perform the diagnostic tests. Even though such tests indicate that a CABG is not reasonable or medically appropriate for the treatment of the patient, Defendants, directly and through their

54

agents and employees, falsely document the existence or extent of a lesion in the patients' medical records and refer them to Defendants' hospitals, where the medically unnecessary procedures are then performed by the cardiologists employed by Defendants. The medically unnecessary procedures were performed with the knowledge and authorization of Defendants, who profit from the scheme.

122. Third, Defendants, directly and through their agents, employees, and co-conspirators, have knowingly and routinely performed surgical procedures to implant temporary and permanent pacemakers in patients including defibrillators, electrophysiology procedures and ablations. In fact, Relator became aware of a practice whereby Defendants actively instituted a campaign to drum up business for these procedures by reviewing patient medical records and contacting certain of their cardiac patient population in what amount to solicitation letters. Pacemakers and implantable cardioverter defibrillators are indicated for patients with heart arrhythmias or fibrillations.

123. An implantable cardioverter defibrillator, or ICD is an electronic device that implanted near and connection to the heart. It detects and treats chaotic, extremely fast, life-threatening heart rhythms, called fibrillations, by delivering a shock to the heart, restoring the heart's normal rhythm. It is similar in function to an external defibrillator (often found in offices and other buildings) except that it is

55

small enough to be implanted in a patient's chest. Only patients with certain clinical characteristics and risk factors qualify for an ICD covered by Medicare.

124. Medicare coverage for the device, which costs approximately $25,000, is governed by the National Coverage Determination ("NCD"). The Centers for Medicare and Medicaid Services implemented the NCD based on clinical trials and the guidance and testimony of cardiologists and other health care providers, professional cardiology societies, cardiac device manufacturers and patient advocates. The NCD provides that ICDs generally should not be implanted in patients who have recently suffered a heart attack or recently had heart bypass surgery or angioplasty. The medical purpose of a waiting period (40 days for a heart attack and 90 days for bypass/angioplasty) is to give the heart an opportunity to improve function on its own to the point that an ICD may be unnecessary. The NCD expressly prohibits implantation of ICDs during these waiting periods, with certain exceptions.

125. Even though such tests indicate that the placement of a pacemaker or ICD is not reasonable or necessary for the treatment of the patient, Defendants falsely document the patient's medical condition and refer the patient to Defendants' hospitals to have a pacemaker surgically implanted by cardiologists employed by

56

Defendants. These medically unnecessary procedures are performed with the knowledge and authorization of Defendants, who profit from the scheme.

126. Diagnostic and cardiac catheterization procedures, including PTCA and stents and pacemaker implantations, are lucrative procedures for the hospital in which they are performed and the physicians performing them. By way of example only, the 2011 Medicare National Average Physician payment for a PTCA of a single vessel with stent (CPT 92980) at an inpatient facility is reimbursed $873.00. The 2011 Medicare National Average DRG payment for the same procedure is $9,902.00 per patient. The physician payment is increased by $243.00 for each additional vessel (CPT 92981), and the DRG payment is increased to $10,996.00 for placement of a drug-eluted stent. Likewise, the 2010 physician reimbursement rates for pacemaker implantation procedures (CPT 33208, 33214, 33224-26, 33249, and 33240) range from $446.00 to $878.00, and in 2011, the inpatient DRG reimbursement ranged from $11,390 (permanent cardiac pacemaker implant *w/o CCIMCC)* to $20,816.00 (permanent cardiac pacemaker implant *w/MCC)* per patient.

127. Not only were these procedures medically unnecessary, but they were also contraindicated by recognized medical standards and deviated from the standard of care by subjecting the patients to unnecessary increased morbidity and mortality

57

risks as a consequence of the procedures. Relator believes that some of these procedures did, in fact, result in the injury of patients.

128. Defendants have knowingly submitted, or caused to be submitted, false and fraudulent claims for reimbursement to the Government Healthcare Programs for the procedures described above, even though regulations, national coverage restrictions, and local coverage determinations specify that only medical services that are reasonable and necessary for the diagnosis and treatment of the illness or injury are covered under the Government Healthcare Programs. Based on Relator's examination of the medical records and documents for the specific patients and procedures identified herein and other patients treated by Defendants, as well as Relator's general knowledge and understanding of the billing and reimbursement procedures of Defendants, Relator states that claims for payment for the medically unnecessary procedures were submitted to the Government Healthcare Programs.

129. Fourth, Defendants have also knowingly and routinely performed medically unnecessary therapeutic vascular procedures, including percutaneous transluminal arterial angioplasty ("PTA") and stenting in the vascular beds of patients, including, for example, the renal, iliac, and superficial femoral arteries.

58

## V.    Illegal Above Fair Market Value Payments by Defendants to Physicians of Kickbacks and Stark Law Violations to Induce Referrals to Defendants' Cath Lab.

130.    Defendants provided illegal kickbacks to various cardiovascular doctors now employed by Defendants to induce them to refer patients for interventional diagnostic and therapeutic cardiac and vascular procedures at Defendants' hospitals and their Cath Lab through acquiring their medical practices at grossly inflated prices and by paying them above-market long-term salaries well in excess of their actual performance and, in many cases, their existing salaries before the acquisition.

131.    The payment of kickbacks is tied to Defendants' scheme to bill the Government Healthcare Programs for medically unnecessary therapeutic cardiac and vascular procedures, as set forth above.  The payment of kickbacks provided Defendants and their cardiovascular physicians with an incentive to pursue medically unnecessary treatments that are costly and pose health and safety risks to patients.

132.    For example, on or about November 15, 2007, Defendants (i) acquired Atlanta Cardiology Group ("ACG") (the largest cardiology groups in the State of Georgia at the time) and an affiliated approximately 49% interest in ACG's physician-owned outpatient Cardiac Catheterization Lab known as CSA of Atlanta,

59

LLC (NPI No.: 1043225758) for an inflated and excessive amount of over $15 million and (ii) agreed to employ each of their approximately 28 to 32 cardiac physicians for 5 years at an inflated above-market excessive salary of $750,000 per year (plus productivity based incentives) that provide payments by Defendants to interventional cardiologists to induce the referral of patients exclusively to Defendants for the cardiac and vascular procedures challenged herein. According to the Atlanta Business Chronical, cardiac services at Saint Joseph's Hospital, which physicians at ACG were then affiliated with, accounted for 30% of the hospital's annual revenue and 95% of ACG's specialists performed 95% of invasive procedures such as cardiac catheterization and pacemaker implants. See http://www.bizjournals.com/atlanta /stories/2007/11/19/story1.html. Additionally, on information and belief, cardiologists from Cardiology of Georgia (20 cardiovascular doctors) and Cardiac Disease Specialists (17 cardiovascular doctors), the two other large practices acquired by Defendants within 6 to 9 months of the ACG acquisition, were each paid post-closing salaries of hundreds of thousands of dollars less than the ACG physicians for comparable skills and services as a result of these "kickbacks". Exceptions to those lower salaries were for senior physicians such as Dr. Charles Brown and Dr. William Blincoe (both from Cardiology of Georgia) who spearheaded and actively enforced many of the wrongful practices

outlined in this Complaint and rose and were rewarded by Defendants with powerful positions on the Board of Directors and senior officer positions at Defendants. Dr. Brown is now the Chief of Cardiovascular Services for Defendants. Defendants on a daily, monthly and yearly basis track the performance and RVU's (Relative Value Units tied to Medicare payments) of each physician and exert pressure on physicians who are not "playing ball" with their program to unlawfully maximize procedures and billing to Government Healthcare Programs as described herein. Dr. Bill Knopf, the managing partner of ACG, became the Chief Operator Officer of the Piedmont Heart Institute and remains in charge of Defendants' Cath Lab. Dr. Mark Cohen, the principal inquisitor involved in the RAC Audits, was also an electrophysiologist with ACG and is currently the Chief Medical Officer of Piedmont Hospital. Incredibly, after paying $15 million for the practice and Cath Lab, Defendants directed these AGC physicians who were now Defendants' employees to direct their patients to Defendants' Cath Lab at Piedmont Hospital which caused the CSA of Atlanta Cath Lab to incur sudden losses and subsequently close. Under these agreements, these cardiac physicians received from Defendants payments that were above-market value, exceeded in almost all cases the dollar value of professional of services billed and collected or patient seen before or after the acquisition provided by these physicians. In fact, in many cases, RVUs for these physicians were

61

consistently year after year 40% to 60% less than the high performing physicians in the practices. These arrangements were not commercially reasonable and were entered into for the purpose of inducing referrals by them to Defendants.

133. At all times, Defendants knew that these claims for payment or approval were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false. Nonetheless, Defendants have knowingly submitted, or caused to be submitted, false and fraudulent claims for reimbursement to the Government Healthcare Programs in violation of the Anti-Kickback Statute and Stark Law.

134. Moreover, Defendants and their now employee cardiologists engaged in a self-referral scheme intended to increase revenues and profits at the expense and welfare of patients.

## VI. Routine Wrongful Inpatient Admissions and Ordering of Diagnostic Testing and Therapies of Cardiovascular Patients by Non-Physician Medical Personnel at Defendants Hospitals.

135. Relator observed that starting on or about 2013 after Defendants' implementation of electronic medical records, that Defendants employed non-physician medical personnel to interview and admit patients in the Emergency Rooms, direct hospital transfers and office admissions throughout the day and night. An electronically placed boiler plate "justification of inpatient hospital

admission due to cardiovascular co morbidities" statement was utilized by Defendants to justify inpatient admission status immediately at the time of admission. An inpatient admission electronic order was placed by the non-physician medical personnel without the knowledge or consent of the admitting physician who would be a cardiovascular specialist. The admitting physician would later evaluate the patient and was expected by Defendants to "sign off" on the electronic admission order without giving a 23-hour period for diagnostic testing and treatment.

136. The nonmedical personnel would order diagnostic and therapeutic cardiovascular tests and procedures without the knowledge, approval or examination of the cardiovascular physician increasing utilization of major cardiovascular diagnostic tests and invasive therapeutic procedures that were not medically necessary which were designed to increase utilization of Defendants hospital resources to maximize economic gain and incentive.

## COUNT I

137. Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims).

138. Relator realleges and incorporates by reference paragraph "1" through "136" as though fully set forth herein.

63

139. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

140. The Relator has standing to maintain this action by virtue of 31 U.S.C. § 3730(b).

141. By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), as amended. These claims include, but are not limited to, claims for medically unnecessary procedures and claims for reimbursement for services that resulted from referrals arising from an improper financial relationship in direct violation of the Anti-Kickback Statute and the Stark Law.

142. The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the Government since the inception of the scheme described herein.

143. By virtue of the false claims presented or caused to by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damages, plus civil money penalties of not less than $5,500

64

and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

144. Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements).

145. Relator realleges and incorporates by reference paragraph "1" through "143" as though fully set forth herein.

146. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

147. The Relator has standing to maintain this action by virtue of 31 U.S.C. § 3730(b).

148. By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, Defendants caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2). The false or fraudulent records and statements include, but are not limited to, records and statements related to claims for medically unnecessary procedures and

65

statements or false certifications relating to services that resulted from referrals arising from an improper financial relationship in direct violation of the Anti-Kickback Statute and the Stark Law.

149. By virtue of, and as a result of, the false records and statements used to get false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,000 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT III

150. Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (Presenting False Claims).

151. Relator realleges and incorporates by reference paragraph "1" through "149" as though fully set forth herein.

152. This is a claim under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, et seq.

153. The Relator has standing to maintain this action by virtue of the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, et seq.

154.   By virtue of the acts described above and Defendants' deceptive and fraudulent actions, Defendants knowingly presented false or fraudulent claims for payment or knowingly caused false or fraudulent claims for payment to be presented, to officials to the State of Georgia in violation of the Georgia False Medicaid Claims Act.

155.   The false claims for payment presented or caused to be presented by Defendants include all claims for reimbursement from the State of Georgia since the inception of the scheme described herein.

156.   By virtue of the false claims presented or caused to be presented by Defendants, the State of Georgia has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT IV

157.   Claim By and on Behalf of the United States under the False Claims Act Relating to Defendants' above-referenced conduct (False Records or Statements).

158.   Relator realleges and incorporates by reference paragraph "1" through "156" as though fully set forth herein.

67

159.    This is a claim under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, et seq.

160.    The Relator has standing to maintain this action by virtue of the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, et seq.

161.    By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the State of Georgia, Defendants caused to be made or used false records or statements to get false and fraudulent claims paid or approved by an agency of the State of Georgia, in violation of the Georgia False Medicaid Claims Act.

162.    By virtue of, and as a result of, the false records and statements used to get false claims by the State of Georgia, the State of Georgia suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States and the State of Georgia, demand and pray that judgment to be entered in their favor as follows against Defendants jointly and severally:

1.     On Counts I and II, under the False Claims Act, against Defendants for treble the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

2.     On Counts III and IV, under the Georgia False Medicaid Claims Act, against Defendants for treble the amount of actual damages suffered by the State of Georgia (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

3.     For all costs of this civil action; and

4.     For such other and further relief as the Court deems just and equitable.

**WHEREFORE**, Relator demands and prays that judgment be entered in her/him favor:

1.     On Counts I and II, under the False Claims Act, for a percentage of all civil penalties and damages obtained from Defendants pursuant to 31 U.S.C. § 3730, reasonable attorney's fees and all costs incurred against Defendants;

69

2.      On Counts III and IV, under the Georgia False Medicaid Claims Act, for a percentage of all civil penalties and damages from Defendants pursuant to the Georgia False Medicaid Claims Act, reasonable attorney's fees and all costs incurred against Defendants;

3.      Directing Defendants to place Relator in a position that she/he would have held but for Defendants' discriminatory and retaliatory treatment of her/him and to make Relator whole for all earnings and benefits she/he would have received but for Defendants' discriminatory and retaliatory treatment including but not limited to wages (including front and back pay and interest thereon) and benefits and any and all other relief afforded under the whistleblower protections contained in 31 U.S.C. § 3730(h), O.C.G.A. § 49-4-168.4 and the protection of employees from discrimination and retaliation under the aforementioned applicable State Acts;

4.      That Relator recover general compensatory damages in an amount to be proven at trial;

5.      That Relator recover punitive and exemplary damages in an amount to be proven at trial;

6.      Relator recover prejudgment and postjudgment interest; and

7.      Such other relief as the Court deems just and proper.

Respectfully submitted this 10th day of March, 2016.


Raymond L. Moss
Georgia Bar No. 526569
rlmoss@mossgilmorelaw.com


MOSS & GILMORE LLP
3630 Peachtree Road
Suite 1025
Atlanta, Georgia 30326
Telephone No. (678) 381-8601
Facsimile No. (815) 364-0515
Email: rlmoss@mossgilmorelaw.com

71